**Patrick Dennis PETRICK, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–91–00389–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

June 18, 1992.
Rehearing Denied July 9, 1992.

Charles E. Hill, III, San Francisco, Cal., for appellant.

John B. Holmes, Jr., Dist. Atty., Timothy G. Taft, Susan Brown, Glenn Gotschall, Asst. Dist. Attys., Houston, for appellee.

Before SAM BASS, MIRABAL and O'CONNOR, JJ.

## OPINION

SAM BASS, Justice.

This appeal is from a conviction for aggravated robbery. After finding an enhancement paragraph true, the jury assessed punishment at 45–years confinement and a $5000 fine.

We reverse and remand for a new trial.

On the afternoon of October 16, 1986, Ms. Karen Shaunessy and Mr. Timothy Clingman were working at a Photomax store located at Gessner and I–10. The phone rang at 5:45 p.m., and Mr. Clingman answered it. A male voice on the other end said only one word, "Karen." Thinking this was rather strange, Mr. Clingman handed the phone to Ms. Shaunessy. He noticed that she did not say much during the conversation, but she seemed to stiffen up and become tense.

The phone call lasted about 30 seconds to one minute. When Ms. Shaunessy hung up the phone, she told Mr. Clingman that the caller was her ex-boyfriend, appellant in this case. She said this was the first contact that he had made with her in two months, and she was upset by the call.

Ms. Shaunessy went home at 6:30 p.m., about 45 minutes after her phone conversation with appellant. About 10 minutes later, while Mr. Clingman was in the back of the store preparing to close for the evening, he heard someone come inside. He walked to the front and saw two men standing at the counter. One man came behind the counter, produced a hunting knife, and told Mr. Clingman it was a robbery. Mr. Clingman testified that the knife

was "very similar in size and shape to what's called a buck folding hunter blade, was five and a half inches long."

The assailant backed Mr. Clingman into a storage room. Mr. Clingman was looking at the assailant's face the entire time, and noticed his intense, "wild looking" eyes. He testified that the look in the assailant's eyes, coupled with the knife, scared him very badly. He thought the assailant might kill him to prevent him from making an identification. The assailant told Mr. Clingman not to try anything. Mr. Clingman responded that he was scared to death and said, "Believe me, I'm not going to die over company money. Go for it."

Mr. Clingman heard the bell on the cash register, indicating that the accomplice had opened it. The assailant then asked where the rest of the money was kept. "He held the knife in his hand with the blade pointing upward, held it right here and went like that...." (The record does not reflect what motion the witness made during this testimony.) Mr. Clingman testified that he felt as though his life was threatened. He told the assailant that more money was in the filing cabinet.

The assailant took out a roll of strapping tape and taped Mr. Clingman's hands together, then taped both hands to his left ankle. He had the knife in his hand at all times.

Mr. Clingman heard the front door open again, and the accomplice said, "We got to go." The assailant jumped up and ran out of the store. Mr. Clingman hobbled to the front of the store to find a customer who had just walked in on the robbery. The customer untaped him and called the police.

While waiting for the police to arrive, Mr. Clingman began wondering if the person who had performed the robbery was the same person that called Ms. Shaunessy. He called her at home, and described to her the person that had just robbed him. She said it sounded like it could be her ex-boyfriend. She told him she had some negatives from which they could print a picture of the caller, and she would bring them to the store immediately.

The police arrived before Ms. Shaunessy. Mr. Clingman described the knife to police as a "folding pocket knife has about a four-inch blade, open and locks open." He also gave them the same description of the assailant that he had given Ms. Shaunessy. When Ms. Shaunessy arrived and began printing the pictures, Mr. Clingman immediately recognized the person in the pictures, who was appellant, as his assailant. In a subsequent police photo spread line up, he was unable to conclusively identify the assailant.

■ In his first point of error, appellant claims the evidence was insufficient to support his conviction. Specifically, he argues that the State failed to show he exhibited a deadly weapon during the commission of the crime.

In reviewing the sufficiency of the evidence, an appellate court must view the evidence in the light most favorable to the verdict to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Butler v. State*, 769 S.W.2d 234, 239 (Tex.Crim.App.1989). The jury, as the trier of fact, is the sole judge of the credibility of the witnesses. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex.Crim.App.1986). If there is evidence that establishes guilt beyond a reasonable doubt, and if the trier of fact believes that evidence, we are not in a position to reverse the judgment on sufficiency of the evidence grounds. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988).

A deadly weapon is anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. TEX.PENAL CODE ANN. § 1.07(a)(11)(B) (Vernon 1974). A knife qualifies as a deadly weapon, just as does any other object, whenever it is "manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury." *Thomas v. State*, 821 S.W.2d 616, 620 (Tex.Crim.App. 1991). Further, a knife may be a deadly weapon, depending on its size, shape, sharpness, the manner of its use or intended use, and its capacity to cause death or

serious bodily injury. *Blain v. State,* 647 S.W.2d 293, 294 (Tex.Crim.App.1983).

■ Wounds need not be inflicted before a knife can be determined to be a deadly weapon. *Davidson v. State,* 602 S.W.2d 272, 273 (Tex.Crim.App. [Panel Op.] 1980). If there was no actual injury, the State is required to support the capacity of the knife to cause serious bodily injury or death by factors such as the manner of use, the size of the blade, threats made by the accused, or the physical proximity of the accused and his victim. *Blain v. State,* 647 S.W.2d at 294.

■ A reading of the record does not tell us exactly how appellant used the knife. We know that Mr. Clingman testified that appellant pointed the knife upward and "went like that." Although we do not know what motion Mr. Clingman was demonstrating, the jury was able to see and hear Mr. Clingman testify, and weighed his credibility in reaching a verdict. We also know from the record that Mr. Clingman felt that his life was threatened by appellant's use of the knife.

There was a discrepancy in testimony concerning the size of the knife. The police officer testified that Mr. Clingman told him the blade was four inches long. Mr. Clingman testified that the knife had a folding hunter blade, which was five and one-half inches long. Appellant argues in his brief that Mr. Clingman was testifying to the length of the whole knife—that is, the blade plus the handle. However, the record clearly shows that he was describing the *blade* of the knife.

Although there was no testimony that appellant verbally threatened Mr. Clingman, Mr. Clingman stated that he was "scared to death" by the knife and appellant's wild-looking eyes. Also, appellant had Mr. Clingman cornered throughout the entire robbery. He never put down the knife, even when he was binding Mr. Clingman's hands and left foot.

In *Tisdale v. State,* 686 S.W.2d 110 (Tex.Crim.App.1985) (op. on reh'g), appellant pulled a knife with a two and five-eights inch blade on a convenience store clerk.

*Id.* at 113. The clerk testified that when appellant displayed the knife, she backed up and allowed him to take the money from the register. *Id.* at 114. She said that she felt threatened by the knife. *Id.* The court held that the actions of appellant in advancing on the clerk and displaying the open knife in his hand were sufficient to show his intent to use the weapon. *Id.* at 115.

The facts of the case before us are very similar to those of *Tisdale.* When appellant produced the knife, Mr. Clingman started backing up. He cooperated with appellant, telling him where the money was located. He said he felt threatened and scared because of the knife. Just as in *Tisdale,* appellant's acts of advancement while displaying the knife were sufficient to show his intent to use the weapon.

The first point of error is overruled.

■ In his third point of error, appellant claims that the trial court abused its discretion by denying his oral motion for continuance so he could present his alibi witnesses. As a general rule, a motion for continuance must be in writing and sworn to by a person having personal knowledge of the facts. However, this rule is not absolute. *O'Rarden v. State,* 777 S.W.2d 455, 459 (Tex.App.—Dallas 1989, pet. ref'd). When the circumstances surrounding the trial court's denial of an oral motion for continuance amount to a denial of the rudiments of due process, such denial is subject to appellate review. *Id.* at 459–60.

■ To determine if appellant's right to due process was violated, it is important to look at the facts leading up to the motion for continuance. The jury was selected on the afternoon of February 28, 1991. The State put on its first witness on Friday, March 1, 1991, at 10:29 a.m. Appellant's attorney knew the State had subpoenaed six witnesses to testify. Presuming that it would take all day Friday for the State to put on its case, he told his alibi witnesses, who were coming from another state, to be in court on Monday, March 4, 1991.

During the lunch break, appellant's attorney made a phone call from the court-

room to verify that his witnesses would be in Houston on Monday morning. At the motion for new trial, the attorney's assistant testified that shortly after the defense lawyer hung up the phone, the prosecutor stood up from behind the judge's bench and left the room.

After the lunch break, the prosecutor finished her examination of her third witness, then rested her case at 2:30 p.m. Appellant called to the witness stand one of the police officers who investigated the case. After completing the examination of the officer, the defense attorney explained to the judge that he was surprised by the State resting so soon, and that his remaining, out-of-state witnesses were unavailable. He then, at 2:45 on a Friday afternoon, made a motion for continuance until Monday morning. The trial court denied the motion, and the defense was forced to rest.

Although Texas has not adopted the federal standard for determining whether a trial court abused its discretion in denying a continuance to present defense witnesses, it is instructive in this case. The federal standard includes the following factors:

1. The diligence of the defense in interviewing witnesses;

2. The diligence of the defense in procuring the witnesses' presence;

3. The probability of procuring their testimony within a reasonable time;

4. The specificity with which the defense is able to demonstrate their expected knowledge or testimony;

5. The degree to which such testimony is expected to be favorable to the accused; and

6. The unique or cumulative nature of their testimony.

*United States v. Uptain,* 531 F.2d 1281, 1287 (5th Cir.1976).

Appellant's attorney had interviewed the alibi witnesses, obtained their affidavits, and made their travel arrangements. Because the witnesses could not afford to miss work, the attorney tried to accommodate them by having them come to Houston on the day they were likely to testify. He noted that the State had subpoenaed six witnesses, and thus concluded that the State's evidence would last until Monday, March 4, 1991.

Appellant's counsel, at 2:45 p.m. Friday, told the judge he would have the witnesses in court first thing Monday morning. Thus, he was asking for a delay of approximately two hours and 15 minutes. He told the judge that these witnesses were expected to testify to appellant's alibi. He had no other witnesses who could do so. In his motion for new trial, appellant's attorney attached the affidavits of the alibi witnesses. These affidavits indicate that appellant was in Missouri on the date the crime was committed.

We conclude that the testimony of these alibi witnesses might have been quite favorable to the accused, particularly in light of Mr. Clingman's questionable identification of appellant. We hold the trial court abused its discretion by denying appellant's motion for continuance, thereby denying him the opportunity to put on an alibi defense, which may have affected the outcome of the trial.

The third point of error is sustained.

■ In his fifth point of error, appellant claims that the trial court refused to dismiss his indictment with prejudice in violation of the Interstate Agreement on Detainers (IADA). Tex.Code Crim.P.Ann. art. 51.14 (Vernon 1979). The IADA provides that, "trial under this article shall be commenced within 120 days of arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance." Tex.Code Crim.P.Ann. art. 51.14, Art. IV(c) (Vernon 1979). If a person is not brought to trial within 120 days, the indictment shall be dismissed with prejudice. Tex. Code Crim.P.Ann. art. 51.14, Art. V(c) (Vernon 1979).

Appellant was indicted on November 21, 1986, and was arrested in Minnesota on January 30, 1988. He contested extradition, and therefore was not extradited until March 27, 1989. Following his arrival in

Texas, his case was reset 17 times. All of the agreed setting forms contain the signature of both the prosecutor and the defense attorney. Agreed resettings are continuances deemed necessary and reasonable, as required by article IV(c) of the IADA. *Bell v. State*, 768 S.W.2d 790, 801 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd); *See Ex parte Saylor*, 734 S.W.2d 55, 57 (Tex.App.—Houston [1st Dist.] 1987, no pet.). Appellant contends that since he did not personally sign the reset forms, he did not agree to them. However, the signatures of the attorneys alone is sufficient. *See Bell*, 768 S.W.2d at 801; TEX.CODE CRIM.P.ANN. art. 51.14, sec. IV(c) (states that either the prisoner *or* his counsel must be present). The delays in bringing appellant to trial were not due to prosecutorial delay; therefore, the IADA provides no remedy for appellant.

The fifth point of error is overruled.

■ In his fourth point of error, appellant claims that the trial court erred in refusing to dismiss the indictment because his federal and state constitutional rights to a speedy trial were violated. He correctly points out that the standard to be applied is that set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The four factors used in making a determination are: (1) the length of the delay; (2) the reason for the delay; (3) the assertion of the right to speedy trial; and (4) prejudice to the appellant. *Id.* at 531, 92 S.Ct. at 2192.

Appellant's trial was delayed over four years from the time the indictment was filed. The reasons for this delay were that: (1) appellant was at-large for 15 months until he was arrested in Minnesota; (2) appellant fought extradition for 14 months; (3) the defense moved for a psychiatric examination; (4) the defense was granted a continuance on the basis of unavailable witnesses; and (5) appellant moved to have his appointed attorneys dismissed twice, causing new attorneys to have to become familiar with the case. Because any delays in bringing appellant to trial were caused by appellant, he waived his constitutional right to a speedy trial. *Bell*, 768 S.W.2d at 801;

*Harlow v. United States*, 301 F.2d 361, 366 (5th Cir.1962), *cert. denied*, 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 56 (1962).

The fourth point of error is overruled.

■ In his sixth point of error, appellant claims that the penitentiary packet, which was admitted into evidence during the punishment phase of trial, does not comply with TEX.R.CRIM.EVID. 901 and 902, for several reasons. Many of the problems appellant has with the pen packet arise from the fact that there are actually two pen packets, State's exhibits two and three. It appears from his arguments that he did not realize this was so.

Appellant first claims that the packets were improperly authenticated. However, a comparison of the affidavit used for State's exhibit two with the example set forth in TEX.R.CRIM.EVID. 902(10)(b) reveals that the two are identical. Although, the affidavit used in State's exhibit three does not exactly track the wording of the example, there is no substantial difference between the two wordings.

Further, appellant claims that the affidavit was insufficient because it was not signed by all the persons listed on the business records. He cites no authority for this proposition. In fact, the affidavits are signed by the person claiming to be the custodian of the records. That signature is sufficient under TEX.R.CRIM.EVID. 902(10)(b).

Appellant also argues that there is a discrepancy between the number of documents in the pen packet and the number of documents listed on the certification page. The affidavit for State's exhibit two states that the packet contains 10 pages. Many of the extra pages appellant has counted are part of State's exhibit three, which were certified by a separate affidavit. The copy of State's exhibit two included in the record has 16 pages. However, five of these pages are inadvertent copies of previous pages, and one page is the certification page. Thus, there were only 10 pages to the packet, as the affidavit states.

Appellant next claims that the pen packet failed to show that he was convicted in the same offense and cause number listed in the indictment. The indictment alleges a conviction on April 20, 1977, for kidnapping in cause number 28925. The third page of State's exhibit two reflects that appellant was convicted of four counts of kidnapping on April 20, 1977. The sentence was to run consecutively with the sentence pronounced in cause number 28928. The very next page in the exhibit is a commitment for cause numbers 28945 and 28928. The clear implication is that cause number 28945 refers to the kidnapping convictions.

Appellant further asserts that the contents of the pen packet were vague and confusing. As already mentioned, much of this confusion stems from the fact that there were actually two pen packets. Appellant expresses confusion over a third cause number appearing in the packet—101385. However, the transcript clearly reveals that this was not a cause number, but appellant's Minnesota convict number.

■ Next, appellant contends that the fingerprint cards contained in the pen packets listed no cause numbers or vital statistics to link them to appellant. However, a single set of fingerprints within a pen packet is sufficient to support multiple convictions reflected in the pen packet, because the fingerprints refer to the packet as a whole. *Hallmark v. State*, 789 S.W.2d 647, 650–51 (Tex.App.—Dallas 1990, pet. ref'd).

Finally, appellant argues that the pen packets contained extraneous material that was prejudicial to him. However, he has failed to identify which material he is calling extraneous. Thus, he has not properly presented this argument for review. TEX. R.APP.P. 74(d).

The sixth point of error is overruled.

In his second point of error, appellant claims that he received ineffective assistance of trial counsel. Based on the recommended disposition of the other five points of error, it is unnecessary to address this point in the opinion.

The judgment of the trial court is reversed, and the cause is remanded for a new trial.