*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

# MEMORANDUM OPINION

No. 04-07-00364-CR

Clarence **BADGETT**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2005-CR-9206A
Honorable Mary D. Roman, Judge Presiding

Opinion by:     Karen Angelini, Justice

Sitting:          Catherine Stone, Chief Justice
                 Karen Angelini, Justice
                 Steven C. Hilbig, Justice

Delivered and Filed:   January 21, 2009

AFFIRMED

Clarence Badgett was found guilty of capital murder and was sentenced to life imprisonment.

He brings five issues on appeal: (1) the trial court erred in denying his motion for directed verdict

because the State did not present sufficient evidence corroborating accomplice witness testimony;

(2) the trial court abused its discretion in denying his motion for continuance; (3) the trial court

abused its discretion in denying his motion for mistrial based on improper outside juror influences;

(4) the trial court abused its discretion in allowing in evidence prejudicial photographs in violation

of Texas Rules of Evidence 401 and 403; and (5) the trial court erred in refusing to submit to the jury the lesser-included offenses of aggravated robbery, robbery, and murder. We affirm.

## BACKGROUND

On August 29, 2005, David Ibarra, the murder victim, asked his friend Matt Veley if he knew anyone from whom Ibarra could purchase marijuana. Veley responded that he had just ran into a former high school classmate, Greg Hayes, who had said he still had access to marijuana. Ibarra told Veley that he wanted to purchase a pound of marijuana and that he had $3000 available to spend. According to Veley's testimony at trial, marijuana at that time was very hard to find.

Ibarra then called his friend Jason Leacock and asked Leacock if Leacock would help him purchase the marijuana. According to Leacock's testimony at trial, Ibarra picked him up around 10 p.m., and then they picked up Veley, whom Leacock had never met before. Ibarra, Leacock, and Veley then went to pick up Hayes, who had said he knew someone from whom Ibarra could purchase a pound of marijuana for $3000. According to Leacock, when they pulled into the complex of town homes, Hayes was sitting on a curb waiting for them. Hayes got into the backseat and directed them where to park. According to Leacock, the plan was for one of them to watch the money in the car while another one went with Hayes to inspect the marijuana. According to Leacock, he and Ibarra looked at each other, and when Leacock reached for the door handle, it was understood between him and Ibarra that Leacock would be the one who would inspect the marijuana with Hayes. Leacock testified that Hayes had to go with him because Hayes was the connection between them and the seller of the marijuana. Ibarra and Veley stayed in the car with the money.

Leacock testified that Hayes then made a phone call to the seller, informing the seller that they "were here." Leacock and Hayes were walking up the path, passing a pool in the complex, when

"two guys jumped out from the corner of the building." Both men were African American. One had a gun. According to Leacock's testimony, the man with the gun demanded the money, hit Leacock with the gun, and pulled Leacock back into the shadows. The man with the gun threatened "to put a hole" in Leacock if he did not tell them where the money was. Neither of the men who accosted Leacock, however, paid any attention to Hayes, who just stood there looking on. Leacock described the man with the gun as "very aggressive." Leacock explained that the man with the gun kept hitting him with it and that the other man also hit and kicked him. Leacock testified that he made up a story about there being another car waiting down the street with the money, telling his attackers that he needed to call the people in this other car and ask them to bring the money. According to Leacock, the two men pulled at his pants, and when they did not find the money, the man with the gun told the other man to sit and watch Leacock. The man with the gun said that he was going to take Hayes and go back to the car in which Leacock and Hayes had arrived. Leacock testified that the man with the gun did not point the gun at Hayes but just "calmly walked away" with Hayes toward the vehicle in which Ibarra and Veley were sitting. Leacock then got up and started running away but a "white man" "came out of the shadows." Thus, Leacock had two men chasing him when he slipped down a drainage ditch. Leacock was lying on the ground while both men were punching and kicking him when two gunshots were fired. The two men who were hitting Leacock turned and ran toward the gunshots. Leacock ran the other way. He eventually made his way back to the car. All the doors to the car and the trunk were open. Leacock found some keys on the floor of the car, but when he tried to start the car, the keys did not work. He then saw Veley across the parking lot on a cell phone. When Leacock asked Veley where Ibarra was, Veley replied that Ibarra had gotten away and said that he had called 911. Leacock, just wanting to leave the scene, asked why Veley had called 911.

Leacock then saw a police car pull into the parking lot. When the police car did not come directly to him, Leacock calmly walked away back to the ditch and into the woods. He walked to a friend's house, and when the friend answered the door, he did not recognize Leacock because of the all the blood on Leacock's swollen face. The next day, Leacock tried to contact Ibarra but was unable to do so. According to Leacock's testimony, it was not until that night on the news that he found out about the shooting that resulted in Ibarra's death. A couple of days later, Leacock went to the police station and was able to identify one of his attackers, the African-American man without the gun, in a photo array. That man, the African American without the gun, was identified as Andre Clewis.

Matt Veley testified at trial that he was sitting in the backseat of Ibarra's car in the parking lot of the complex, waiting for Leacock and Hayes to return, wondering why it was taking them so long to inspect the marijuana, when he saw Hayes and an African-American male "turn the corner." Veley described the African-American male as a "taller male, black, shaved head." According to Veley, "[i]t was darker when he was walking up, so I couldn't see exactly – or like as clear as I could until he got into the car." Hayes stood by the car with his hands up. The African-American male then walked around to the passenger's side of the car and got into the back seat. Hayes remained standing by the car with his hands up. The African-American male then pulled a gun out of his clothes, which Veley described as "a clip Fed, black, top of the barrel was shiny metallic, and it had three grooves on the portion of the barrel." The African-American male demanded the money. According to Veley, Ibarra at first claimed he did not have the money, but once the African-American male "pistol whip[ped]" Ibarra a few times, Ibarra handed over the money, which he had kept in a brown paper bag underneath the car seat. The African-American male then demanded money from Veley, who replied that he did not have any and pulled out his pockets as proof, causing his credit cards and cell

phone to fall out. According to Veley, the African-American male took Veley's credit cards and cell phone. Veley described this man who robbed him and Ibarra at trial:

> He was like a dark skinned, black male, shaved head. And what I remember most was his eyes, and like he was just full of anger and like rage and it was – he had like I could tell he wasn't joking around at all or messing around. He was really serious.

At trial, Veley identified the defendant, Clarence Badgett, as the man with the gun who robbed him and Ibarra in the car. According to Veley, after Badgett took his cell phone, Badgett turned his attention back to Ibarra:

> Like every time he pistol whipped David [Ibarra] about three times, and then like every time David tried to say something, he would pistol whip him like a few more times totaling about a half dozen times in the car. And then after that, he told David to pop the trunk and for both me and David to get into the trunk. And at that point, David popped the trunk, opened the door, and started running. . . . Once David pops the trunk, he opens the door and starts running off to the left of the car. And after that, Clarence [Badgett] opens the back passenger side door and starts to run after David. After [Badgett] passes like or clears the car, David's car, I get out. I open my door and start running the opposite direction. And then I stop about fifteen to twenty yards behind the car and turn around and see what's going on. . . . Greg [Hayes] was still up next to the car. . . . I believe – or [Hayes] ran, like he ran after Clarence started chasing David, and I got out of the car, then [Hayes] ran out the other – or ran to the right of the car. . . . I saw [Badgett] running up and catching up with David. And then he, when he caught up to [Ibarra], he was holding the cell phones, and they were starting to struggle. And [Badgett] dropped the cell phone, all three of the cell phones he took from me and David. And then after he pistol whipped [Ibarra] two more times, I heard two shots go off. And after the two shots went off, David split running towards the street . . . and then Clarence ran into the apartment buildings.

Veley clarified that when he heard the gunshots, Badgett and Ibarra "were right next to each other, and so point blank." When later asked to clarify what he meant by point blank range, Veley testified, "It means within a very close proximity, either right up or within one or two or maybe three feet from a person."

At trial, Veley was asked if, after hearing the gunshots, he thought Ibarra had been shot:

I wasn't sure at the time, because after the shots, I saw David run to the left, and I thought he might be okay. I mean, I couldn't get a clear – see clearly as to like, you know, if he was shot or not at that time. So, I thought he might be all right and just got away. And then all I saw, like after that, I called the cops and told them I heard gunshots. And then I saw red and blue flashing lights, and I saw David on the corner dying.

According to Veley, he had used one of the phones Badgett dropped to call 911. Before the police arrived, he saw Leacock:

At that point, Jason [Leacock] walks up to me; he is in his boxers and like stripped down. And he's pretty much – he's pretty badly beaten. And I tell him, I told him I heard gunshots, and I thought David might have got away because I wasn't sure what happened to him at that point. I told him I already dialed 911, and I made a call. I told him he could get out of here, but I've already called the cops, and I need to stay. I was already involved and [had] already committed myself to this because I dialed 911, and so I had to be there to explain to the cops.

Veley testified that Leacock walked away, and thirty seconds later, the police arrived. Because the police had a spotlight on the corner of the street, Veley was able to see Ibarra lying on the ground. Veley stayed with Ibarra until he died. A few days later, Veley was shown a photo array with six pictures. According to Veley, he was "immediately able to rule out four of them." He then took a closer look at the remaining two and "was able to pick out the person who shot David." The man whom Veley picked out of the photo array was identified as the defendant, Clarence Badgett.

James Zawatski, a neighbor of Hayes and a resident of the complex of town homes where Ibarra was killed, also testified at trial. Zawatski testified that he bought small amounts of marijuana from Hayes. On the day of the murder, Zawatski was at Hayes's town home. They were waiting on a phone call to see if they could purchase a small amount of marijuana, when John Casanova came to visit, saying that he had just gotten out of jail. According to Zawatski, Casanova carried himself like "a gang-related type." Zawatski and Hayes were smoking the last of their marijuana, but

Casanova did not smoke any because he did not want to test positive. Zawatski testified that he then "heard talk of a friend of Greg [Hayes] or John [Casanova], I'm not sure, looking for a large amount of marijuana." According to Zawatski, "[a]t that point in time, it was hard to find marijuana. That was, as we would say, a drought season." Hayes and Casanova asked Zawatski if he could find a large amount of marijuana, but Zawatski replied that he could not. Zawatski testified that Hayes and Casanova then moved away from him to converse and that he heard Casanova say the phrase "hit a lick," which means to rob someone. Casanova then called a friend nicknamed "Dro." When "Dro" showed up, Zawatski recognized him as Clarence Badgett. Badgett had brought another African-American male with him, a man Badgett referred to as his cousin. Zawatski testified that Casanova and Hayes "were trying to look for a small amount of marijuana to show to the purchaser," but they were unable to find any. Zawatski testified that Badgett, his "cousin," Hayes, and Casanova "were planning to rob someone for their money":

> There were calls made to the purchaser on a time basis [sic] of when it would be there and, you know, basically just a time basis telling them when they would be able to meet up.

Zawatski heard talk of the four splitting the money they obtained:

> I heard that the money would be split evenly amongst the four, and the fact of where they would do it. Because in the beginning they did not want to do it where Greg [Hayes] – Greg did not want to have it done where he lived. . . . Greg was about the only one with the discussion of taking care of their business somewhere else. Everybody else was pretty much, let's just get it done and over with. . . . They were basically just going to ask for his money, and if not, they were going to use physical violence with fists.

According to Zawatski, he decided "it would be in [his] best interest to leave" and left to go home. About ten to twenty minutes later, he stepped outside to smoke a cigarette when he heard two gunshots. Shortly after the gunshots, he saw Hayes get into his mother's car and drive by. Zawatski

stopped Hayes and asked what had happened. According to Zawatski, Hayes responded not to worry about it and kept going. The next morning, Zawatski was questioned by a detective if he had been with Hayes. Zawatski responded that he had been with Hayes and was taken down to the police station for questioning. Zawatski was shown photo lineups and from those lineups was able to identify Hayes, Casanova, and Badgett.

John Casanova also testified at trial. He and Badgett, or "Dro," had been close friends for three years, and he and Hayes had been friends since the seventh grade. He knew Andre Clewis as Badgett's cousin. At the time of trial, Casanova had entered into a plea-bargain agreement: In exchange for his testimony and his plea of guilty to aggravated robbery, the State would recommend a life sentence. According to Casanova, on the day of the murder, he had just finished serving a "drug court sanction [of] a weekend in jail for a dirty UA analysis" and was released at about 8:00 a.m. Casanova then "registered for high school, got [his] shots, and went home" at around 5:00 p.m. He then went to visit Hayes and "Jimbo" [James Zawatski], who lived about four blocks away. They were eating pizza and watching television when Hayes got a phone call and told Casanova that he [Hayes] needed to speak with Casanova in private:

> [Hayes] told me that he had a friend [who] needed some marijuana, a pound. He said [the friend] had $3000 to pay for it, and that he wanted me to call my friend Dro so we could rob [the friend].

When asked why Hayes wanted him to call Badgett, also known as "Dro," Casanova replied, "Because we both knew that Dro would do it." Casanova called Badgett and told him that "Greg [Hayes] has a lick and he needs to talk to you." According to Casanova, he gave the phone to Hayes because Hayes knew the details. Hayes and Badgett talked for about five minutes, and after Hayes hung up, he told Casanova that Badgett was on his way and that Badgett wanted them "to find a

sample of high-grade marijuana to show [the buyer] so [the buyer] would think we actually had the marijuana." However, they were not able to find any marijuana. Badgett and his cousin, "Dre," then showed up. According to Casanova, he was not expecting "Dre," who he had only met five or six times before to accompany Badgett. Casanova testified that he sat on the curb with "Dre" while Badgett and Hayes argued about where to rob the buyer:

> Finally, Jimbo [James Zawatski] came up with the idea of doing it at the other pool, and we all just agreed on it. So, we walked down to the second pool. And when we got there, Jimbo went to go wait down in the ditch, and Greg [Hayes] went to the front of the town homes to wait for the buyers to come. . . . Greg walked off this way. And when he had walked off, I'm not sure who said it, if it was Clarence [Badgett] or Andre [Clewis], one of them said go get that, or do you want me to get that. But either way, Andre walked off this way. And, when he returned, he had a pistol with him, and we walked over. I was standing right here. Clarence was using my phone to call Greg because he was taking awhile. And, he gave my phone back to me. He said, "They are on their way." He told me to go wait in the ditch with Jimbo. Now, we knew that Jimbo was going to be somewhere down in this area. So, I walked down this way, but instead of going down here and waiting with Jimbo, I stopped and waited right here. . . . Well, while I was right here, I saw Clarence and his cousin right here. I could tell who they were because Andre was wearing a hat and Clarence wasn't. Then I see Greg walk up this way with somebody I have never seen before. And when they get right here, [the person is] hit, and they start taking his clothes off. . . . They start going through his clothes. And Greg is standing there with his hands up. He had said that he was willing to take a hit if necessary to make it look like it was a real robbery and that he was being robbed too, so he wouldn't be blamed with anything. And I guess that this person didn't have anything on him because at that time Clarence and Greg walked back this way at gunpoint. . . . Andre stayed right here with the person.

At trial, Casanova then clarified that it was Clarence Badgett who walked away holding the gun. According to Casanova, the person lying on the ground then jumped up and started running in Casanova's direction toward the ditch. Casanova tripped the man, causing the man to fall down the ditch. Casanova then began kicking the man, and when Clewis caught up, Clewis "got real down close to his face and hit him twice and asked him where he thought he was going." Casanova then heard two gunshots and told Clewis to "check it out" while he stayed "here with this bitch."

Casanova testified that Clewis was gone "fifteen seconds at the most" when Clewis and Badgett came running toward him, yelling that "we had to go." Casanova followed them, leaving the man whom he had tripped on the ground. Badgett, Clewis, and Casanova ran back to Casanova's mother's home where they counted and split the money, which totaled about $3,000:

> Before we knew that Andre [Clewis] was going to come along, we had agreed to split a thousand each. And then as soon as Andre – as soon as we found out Andre was going to be there, me [sic] and Andre agreed to split one thousand and take five hundred each. And Greg [Hayes] would take a thousand, and Clarence [Badgett] would take a thousand. And then when we arrived at my mother's house, it was just me, Clarence, and Andre.

Casanova testified that he was not sure what happened to Hayes, and because Hayes was not present, Casanova took $800, Clewis was given $800, and Badgett "kept the rest." The next morning, Casanova found out that there had been a murder in the town homes. When he got home from school, a detective had left a card at his home. Casanova called Badgett and asked Badgett what he should tell the police:

> [Badgett] told me to tell them that I was out in the town homes that night, and there was a big party out there, and that I was real drunk, and there was, you know, the news had reported two black males had done the crime. So he told me to just say there was a bunch of black people out there, and I just didn't know but that a bunch of people were using my cell phone that night.

The next day, Casanova told this story to detectives who then told Casanova things only Hayes would know. So, Casanova "tried to switch it up and put it back on Greg [Hayes] completely." Later, Badgett and his mother came to Casanova's home and told him "to stick to their story." A couple of days later, Casanova talked to the police again, but did not "tell the complete truth yet." According to Casanova, he "fed them a little bit," because he was trying to protect Badgett and then gave up and tried to protect himself. Eventually, Casanova confessed and was arrested for capital murder.

Badgett was also eventually arrested and charged with capital murder. He was found guilty and sentenced to life imprisonment. He now appeals.

### ACCOMPLICE-WITNESS TESTIMONY

In his first issue, Badgett argues that the trial court erred in denying his motion for directed verdict because the State did not present sufficient evidence corroborating John Casanova's accomplice-witness testimony as required by article 38.14 of the Texas Code of Criminal Procedure. A complaint about overruling a motion for directed verdict is in actuality an attack upon the sufficiency of evidence to sustain the conviction. *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997). We note that Badgett in his brief does not complain that the evidence was insufficient to sustain his conviction; instead, he argues that the non-accomplice evidence was insufficient to corroborate the accomplice-witness testimony.

Article 38.14 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). The test for sufficient corroboration is to eliminate from consideration the accomplice testimony and then examine the other inculpatory evidence to ascertain whether the remaining evidence tends to connect the defendant with the offense. *McDuff*, 939 S.W.2d at 612. Thus, in order to determine whether the accomplice-witness testimony is corroborated, we eliminate all accomplice evidence and determine whether the other inculpatory facts and circumstances in evidence tend to connect appellant to the offense. *Id.*

In applying this test, we note that the non-accomplice evidence does not have to directly link Badgett to the crime, nor does it alone have to establish his guilt beyond a reasonable doubt. *See id.*

at 613. Rather, the non-accomplice evidence merely has to tend to connect Badgett to the offense. *See id.* Further, the accomplice witness testimony in a capital murder case does not require corroboration concerning the elements of the aggravating offense, i.e. the elements which distinguish murder from capital murder. *Id.* Evidence that Badgett was in the company of the accomplice, Casanova, at or near the time or place of the offense is proper corroborating evidence. *See id.*

In reviewing the record, we find an abundance of evidence that tends to connect Badgett to the offense. Jason Leacock, a non-accomplice witness, testified that two African-American males attacked him and demanded money. According to Leacock, one African-American male was carrying a gun and hit him with the gun multiple times. Leacock testified that he was not able to identify the man with the gun. However, he was able to identify the other African-American male, the man without the gun, as Andre Clewis, Badgett's cousin. Leacock testified that after discovering that he did not have the money, the African-American male with the gun left with Greg Hayes toward the parking lot.

Matt Veley, also a non-accomplice witness, testified that while he was waiting in the car with David Ibarra, the murder victim, he saw Hayes and an African-American male turn the corner of the town homes and approach the car. According to Veley, Hayes remained standing by the car while the African-American male got into the backseat of the car beside him. Veley testified that the African-American male then pulled out a pistol, demanded the money, and "pistol-whipped" Ibarra when Ibarra refused to hand over the money. According to Veley, when Ibarra fled from the car, the African-American male followed Ibarra. Veley then jumped out of the car and began running in the opposite direction. He stopped after "about fifteen to twenty yards" to see what was happening.

Veley saw Badgett catch up to Ibarra and then watched them struggle. Veley then heard two shots being fired. Veley was able to identify the African-American male with the gun as Clarence Badgett.

Leacock's and Veley's testimony was consistent with the testimony of Casanova, an accomplice witness, and Zawatski, an arguable accomplice witness. All four witnesses testified to the same sequence of events.

Badgett argues that Veley's testimony was not consistent with the assistant medical examiner's testimony, emphasizing that Veley testified Badgett shot Ibarra at "point blank" range while the assistant medical examiner testified to no-evidence of a close-range shooting. We disagree. The assistant medical examiner, Dr. Rajesh Kannan, testified that there was no evidence of a close-range firing, which he explained meant that Ibarra was shot from a distance of *more than two feet*. And, when Veley was asked what he believed "point blank" to mean, Veley testified that "[i]t means within a very close proximity, either right up or within one or *two or maybe three feet from a person*." (emphasis added). Thus, Veley's testimony is consistent with Dr. Kannan's findings.

Further, we note that although Veley testified he thought Ibarra had not been hurt because Veley had seen him run away, Dr. Kannan testified that it was possible that someone with the type of injury suffered by Ibarra could have walked "around a certain distance." Thus, Veley's testimony was not inconsistent with Dr. Kannan's testimony.

We hold that the non-accomplice witness testimony sufficiently corroborated the accomplice-witness testimony.

**MOTION FOR CONTINUANCE**

In his second issue, Badgett argues that the "trial court abused its discretion when it effectively denied the motion for continuance based on a discovery violation in contravention of Article 39.14 of the Texas Code of Criminal Procedure." We disagree.

On April 10, 2007, during jury selection, the State gave Badgett copies of letters allegedly written by and exchanged between Badgett and co-conspirator Casanova during April and May of 2006 when they were both in jail. The next day, April 11th, Badgett filed a written motion for continuance. The trial judge granted his motion and continued trial until the next day. The next morning, April 12th, Badgett orally re-urged the motion for continuance. Badgett, however, did not file a written motion for continuance. Badgett's oral motion was denied.

The State argues that Badgett, by failing to file a second written motion for continuance, has waived any error. We agree.

To preserve error for appeal, a defendant must file a written motion for continuance. *See* TEX. CODE CRIM. PROC. ANN. art. 29.03 (Vernon 2006) (explaining that a criminal action may be continued "on the written motion of the State or of the defendant, upon sufficient cause shown"); *Dewberry v. State*, 4 S.W.3d 735, 755 (Tex. Crim. App. 1999) ("A motion for continuance not in writing and not sworn preserves nothing for review."); *Montoya v. State*, 810 S.W.2d 160, 176 (Tex. Crim. App. 1989) (same). Badgett's first motion complied with this requirement. However, as that motion was granted, Badgett cannot complain about it on appeal. *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("To preserve error for appellate review, a party must make a timely and specific objection or motion at trial, and there must be an adverse ruling by the trial court. Failure to preserve error at trial forfeits the later assertion of that error on appeal."). Badgett's second

motion was not a written motion, but a mere oral "re-urging" of his first motion. Thus, Badgett did not comply with the requirement that a motion for continuance be written. And, we note that Badgett has not argued that he was incapable of complying with the requirement of a written motion for continuance. *Cf. Petrick v. State*, 832 S.W.2d 767, 770-71 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd) (holding that trial court abused its discretion in denying oral motion for continuance because denial of motion deprived the defendant of rudiments of due process). Indeed, the record reflects that Badgett's first motion for continuance was granted; therefore, he had the rest of the day and overnight to prepare a second written motion for continuance. Thus, by failing to file a second written motion for continuance, Badgett failed to preserve error for appeal. *See Montoya*, 810 S.W.2d at 176.

## MOTION FOR MISTRIAL

In his third issue, Badgett argues that the trial court abused its discretion when it failed to grant a mistrial based upon improper outside juror influences. We disagree.

We review the denial of a motion for mistrial for abuse of discretion. *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).

On the second day of trial, during the State's examination of San Antonio Police Officer Luis Tijerina, the trial judge informed Badgett that she had just been informed by the bailiff that Juror No. 13 had been approached by a "big man" who said "something along the lines, "You know that kid that [sic] was killed, he was really a good guy." The trial judge noted that the man was not currently in the courtroom and that she had instructed the deputies he was not to enter the courtroom unless the trial judge talked to him first so that she could "ensure that this man would not approach anyone." Defense counsel responded,

If he comes back, would you advise him — he's, I don't know if it's kind of menacing to my client's mother. He keeps walking over to her, giving her [the] eye, walking by. She's getting just scared of him. She's getting nervous. So, if [you could] tell him to stay away from her as well.

The trial judge responded, "Well, hopefully, he will not be back." The prosecutor then continued with her examination of Tijerina. The defense then cross-examined Tijerina. Next, the State called Ramon Rios, a crime scene technician, to the witness stand. After Rios was done testifying, the following exchanged occurred:

Defense: Earlier when you had said that the gentleman called Juror 13, I guess in my mind I was thinking about cross examination — I was thinking the 13th juror. When I looked at our list, Juror 13 is actually one of our jurors. She's Juror No. 7 . . . . And that does cause me some concern.

Court: Well, I was surprised that you didn't say anything.

Defense counsel explained that "[i]t didn't register at the time. I was thinking we have twelve jurors, and he called Juror 13." Defense counsel then requested that the trial judge question the juror about what had happened.

The State argues that by not objecting when the trial judge first informed Badgett of the man who approached the juror, Badgett waived any complaint on appeal. Assuming without deciding Badgett preserved error for appeal, we hold that the trial court did not abuse its discretion in denying his motion for mistrial.

The trial judge first asked the deputy what Juror 13 had told her about the incident. According to the deputy, the juror said that "the gentleman [who] was sitting in the gallery . . . the large man [who] was sitting in the gallery approached her and asked her if she had known — if she knew the man [who] was dead [who] had been shot." The man then told her that the victim "was a

good man." The trial judge then called in Juror 13, who explained that, during the lunch break, she had been walking with the other jurors. Because she was waiting for her husband, while the other jurors kept walking to a restaurant, she stayed near the street:

> When [the other jurors] walked off across the street, [the man] kind of started lingering around. And I had a feeling he might say something. And he came up and he said, that young man [who] died was a real nice young man, real nice young man.

Juror 13 then stated that she did not respond, and the man walked across the street to the parking lot. She then reported the incident to the deputy. And, according to Juror 13, when she told the deputy about the incident, the other jurors were in the room. When asked, Juror 13 stated that she did not believe her role as a juror had been compromised in any way by the man's statement.

The trial judge then reassured Juror 13 that the man was not present in the courtroom, that he had left voluntarily, and that if he were to come back, he would have to talk to the judge before she would allow him to remain in the courtroom. Juror 13 then explained, "It just made me nervous because I was standing there by myself. . . . And, you know, I kind of felt like he maybe waited until the others walked off." The trial judge then told Juror 13 that the man did not have access to any personal information about her and would not be able to identify her and locate her. Juror 13 indicated that she understood and thanked the judge. The other jurors then returned to the courtroom, and the trial judge instructed them as follows:

> Ladies and gentlemen, I understand that [Juror 13], one of your peers, has been contacted by an individual who was present this morning and listening to the trial. And I would like to caution you that one of the reasons that you wear your badge when you are here is so that you can be identified as a juror. And we are a very small community. People like to talk about the cases that are being tried. And so you may be walking down the hallway, you may be in the elevator, and somebody will start talking about cases. When they realize that you are a juror, they have no idea which case you are trying or you are hearing, they will refrain from talking about the case in your presence. By the same token, we also have family members of all the parties [who] are involved in this litigation. As you can understand, those family members

are very much affected by the trial. It doesn't make a difference whether it's the defense or the State's witnesses. Everybody is affected. And so I want you to be aware of this and also aware of the fact that if a person should try to talk to you about the case, then by all means stop them. Try to get their name, walk away, and then report it to me as soon as you can. You should make a decision based on what you hear from this witness stand and only the evidence you hear in this courtroom. With that, I will proceed, and we will call the next witness.

Article 36.22 of the Texas Code of Criminal Procedure, titled "Conversing with jury," states that "[n]o person shall be permitted *to converse with a juror* about the case on trial except in the presence and by the permission of the court." TEX. CODE CRIM. PROC. ANN. art. 36.22 (Vernon 2006) (emphasis added); *see also* TEX. R. APP. P. 21.3(f) (providing that a defendant must be granted a new trial when a juror has *talked with* anyone about the case) (emphasis added). If a juror does converse with an unauthorized person about the case, injury to the defendant is presumed; however, the State may rebut this presumption of harm. *Robinson v. State*, 851 S.W.2d 216, 230 (Tex. Crim. App. 1991).

In interpreting article 36.22, the Texas Court of Criminal Appeals has held that the phrase "to converse with a juror" does not encompass statements to which there is no response. *See Palasota v. State*, 460 S.W.2d 137, 141 (Tex. Crim. App. 1970) (holding that because juror did not respond to unidentified woman who asked how the jurors could "sleep good at night" and who stated that "[t]he damned jury ought to be shot between the eyes," the statements made to the juror "did not constitute conversation within the meaning of article 36.22"); *See also Leininger v. State*, No. 14-97-00588-CR, 1999 WL 459545, at *2 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (not designated for publication) (holding that statements made regarding how the jury was not fair did not constitute conversation within the meaning of article 36.22 because there was no evidence that the jurors responded to the comments or otherwise engaged in any conversation); *Caraballo v. State*,

No. 01-85-0661-CR, 1986 WL 20860, at *4 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (not designated for publication) (holding that statement to juror to "hang 'em" did not constitute conversation because "[i]t is well established that unresponded-to communications with a juror do not constitute a conversation under article 36.22"). Thus, unless a juror responds to a statement, no conversation within the meaning of article 36.22 has occurred, and no burden is imposed on the State to rebut presumed harm. *Leininger*, 1999 WL 459545, at *2; *see Palasota*, 460 S.W.2d at 141.

Here, Juror 13 did not respond to the statement made by the man. Thus, no conversation within the meaning of article 36.22 took place, and the trial court did not abuse its discretion in denying Badgett's motion for mistrial.

Badgett also argues that the trial judge denied him "the right to full inquiry" in violation of Texas Rule of Evidence 606(b) and article 1.05 of the Texas Code of Criminal Procedure. According to Badgett, the trial judge denied "the defense request to individually question all the members of the jury." However, in our review of the record, we can find no such defense request to individually question all the members of the jury. Therefore, Badgett did not preserve any error for appeal.

We overrule this issue.

### PHOTOGRAPHS

In his fourth issue, Badgett argues that the trial court abused its discretion in allowing the admission of prejudicial photographs in violation of Texas Rules of Evidence 401 and 403. Specifically, Badgett points to photographs that were admitted as State's Exhibits 8, 9, 10, 11, 12, and 43. State's Exhibit 8 depicts the victim lying on the ground. In State's Exhibit 9, a person is holding up the victim's shirt so that the gunshot wounds to the victim's abdomen are shown. State's Exhibit 10 is a close-up that shows the gunshot wounds to the victim's head. State's Exhibit 11 is

another photograph of the victim lying on the ground. State's Exhibit 12 is a photograph of the victim's torso and head. And, State's Exhibit 43 is an autopsy photograph that shows a close-up of the victim's face.

We review a trial court's decision to admit photographs for abuse of discretion. *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997); *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992).

With respect to State's Exhibits 8, 9, and 10, Badgett has failed to preserve error for appeal. When the State moved to offer State's Exhibits 8, 9, and 10, defense counsel replied that she had no objection. Thus, any error related to these photographs cannot be brought on appeal. *See* TEX. R. APP. P. 33.1. Defense counsel did object to State's Exhibits 11 and 12 because they "are just redundant" and "are more prejudicial than probative under 403." The State replied that it was offering "them into evidence because they show [the victim]'s injuries dealing with how he was beaten." And, defense counsel objected to State's Exhibit 43 as being "cumulative."

First, we note that any error in the admission of State's Exhibits 11, 12, and 43 is harmless. "It is well-established that the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence." *Aguilera v. State*, 75 S.W.3d 60, 68 (Tex. App.—San Antonio 2002, pet. ref'd); *see Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986). Here, Badgett admits that Exhibits 11, 12, and 43 are redundant to other photographs to which he urged no objection at trial. Thus, any error would be harmless.

Second, the trial court did not abuse its discretion in overruling Badgett's objection to Exhibits 11 and 12 pursuant to Texas Rule of Evidence 403. Under Rule 403, all relevant evidence is admissible unless "its probative is *substantially* outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403 (emphasis added). Rule 403 carries with it the presumption that relevant evidence will be more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996); *Legate v. State*, 52 S.W.3d 797, 806 (Tex. App.—San Antonio 2001, pet. ref'd). Consequently, there must be a marked disparity between the evidence's prejudice and its probative value before the Rule 403 balancing test requires exclusion. *Legate*, 52 S.W.3d at 806. In considering whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, the trial court may consider several factors, including but not limited to, the following: (1) the number of exhibits offered, (2) their gruesomeness, size, and detail, (3) whether they are in black and white or color, (4) whether they are close-up, (5) whether the body is naked or clothed, and (6) the availability of other means of proof and the circumstances unique to each case. *Williams*, 958 S.W.2d at 196. In making this determination, the trial court is given wide discretion. *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995); *Legate*, 52 S.W.3d at 806.

Here, nothing depicted in State's Exhibit 11 (a photograph of the victim lying on the ground) and State's Exhibit 12 (a photograph of the victim's torso and head) was not also included in the testimony of witnesses at trial. Photographs are generally admissible where verbal testimony about the same matters is admissible. *Jones*, 944 S.W.2d at 652; *Legate*, 52 S.W.3d at 807. The exhibits constituted only two photographs and depict nothing more than the reality of the brutal crime committed. *See Sonnier*, 913 S.W.2d at 519. The victim's body was clothed, and there are not extreme close-up shots. Thus, we conclude that the trial court did not abuse its discretion in

concluding that the probative value of the complained of photographs was not substantially outweighed by the danger of unfair prejudice.

Finally, with respect to Badgett's objection to State's Exhibit 43, an autopsy photograph of the victim's face, being "cumulative," we find no abuse of discretion by the trial court. In *Alvarado v. State*, 912 S.W.2d 199, 212 (Tex. Crim. App. 1995), the Texas Court of Criminal Appeals, in addressing whether photographs were inadmissible because they were needlessly cumulative, explained that Rule 403 provides that relevant evidence may be excluded if its probative value is *substantially* outweighed by the countervailing consideration of the *needless* presentation of cumulative evidence. In interpreting Rule 403, the court explained that unlike the "danger" of unfair prejudice, confusion of the issues, or misleading the jury, the "considerations of undue delay" and "needless presentation of cumulative evidence" "are concerned with the efficiency of judicial proceedings rather than the threat of inaccurate decision." *Id.* (quotation omitted). The court then explained why the trial court did not abuse its discretion in admitting the photographs:

> Assuming *arguendo* that some or all of the photographs were cumulative, appellant has shown us no basis for concluding that a reasonable trial judge would necessarily find that their probativeness was substantially outweighed by their detrimental effect on the efficiency of the trial process. In summary, we discern no abuse of discretion on the part of the trial court in the admission of the photographs.

*Id.* at 213. Likewise, here, Badgett has not explained how the autopsy photograph of the victim's face would be *substantially outweighed* by their detrimental effect on the efficiency of the trial process.

We overrule this issue.

## LESSER-INCLUDED OFFENSES

In his fifth issue, Badgett complains that the trial court abused its discretion in refusing to submit the lesser-included offenses of aggravated robbery, robbery, and murder pursuant to Article 37.09 of the Texas Code of Criminal Procedure. In response, the State argues that there is no evidence in the record that would permit a rational jury to find that if Badgett was guilty, he was only guilty of the lesser offenses of aggravated robbery, robbery, or murder. We agree with the State.

A defendant is entitled to the submission of a lesser-included offense if a two-pronged test is met: (1) the lesser-included offense must be included within the proof necessary to establish the offense charged, and (2) some evidence must exist in the record that would permit a rational jury to find that if the defendant is guilty, he is guilty only of the lesser offense. *Solomon v. State*, 49 S.W.3d 356, 368-69 (Tex. Crim. App. 2001). Here, Badgett fails to meet the second prong.

"In considering whether there is some evidence in the record that a defendant, if guilty, is guilty only of the lesser offense, '[i]t is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. Rather, there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted.'" *Solomon*, 49 S.W.3d at 369 (quoting *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997)). "The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense." *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000).

Badgett was charged with capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2008). The jury was instructed that it should find Badgett guilty if it found from the evidence beyond a reasonable doubt that Badgett, either acting alone or as a party, did intentionally causing the death of Ibarra by shooting Ibarra with a firearm while, either acting alone or as a party, was in

the course of committing or attempting to commit the offense of robbery. The jury was also instructed that one is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by conduct of another for which he is criminally responsible, or by both. The jury was further instructed that a person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Thus, the second prong is met only if there is evidence in the record from which a jury could rationally conclude that Badgett was (1) only guilty of murder (and not a murder committed in the course of committing a robbery); or (2) only guilty of robbery or aggravated robbery (and thereby, not guilty of the murder, by his own hand or as a party). *See Solomon*, 49 S.W.3d at 369.

In reviewing the record, we conclude that there is no evidence from which a jury could rationally conclude that Badgett was guilty only of aggravated robbery, robbery, or murder. There is no dispute that David Ibarra was shot and killed in the course of a robbery. *See id.* And, the uncontradicted testimony at trial was that Badgett was the one who shot and killed Ibarra. The evidence at trial did not establish aggravated robbery, robbery, or murder as valid rational alternatives to felony murder. *See Wesbrook*, 29 S.W.3d at 113. Therefore, we hold that there is no evidence that would permit a jury to rationally find that if Badgett was guilty, he was guilty only of the lesser-included offenses of murder, robbery, or aggravated robbery.

## CONCLUSION

We affirm the judgment of the trial court.

Karen Angelini, Justice

DO NOT PUBLISH